UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA            :        <u>SUPERSEDING</u>
                                    :        <u>INDICTMENT</u>
        -v-                         :
                                    :
ISAI SCHEINBERG,                    :        S3 10 Cr. 336 (LAK)
RAYMOND BITAR,                      :
SCOTT TOM,                          :
BRENT BECKLEY,                      :
NELSON BURTNICK,                    :
PAUL TATE,                          :
RYAN LANG,                          :
BRADLEY FRANZEN,                    :
IRA RUBIN,                          :
CHAD ELIE,                          :
        and                         :
JOHN CAMPOS,                        :
                                    :
                                    :
        Defendants.                 :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2-10-11

<u>COUNT ONE</u>

(Unlawful Internet Gambling Enforcement Act Conspiracy)

        The Grand Jury charges:

<u>Introduction</u>

        1.      From at least in or about November 2006, and
continuing through in or about March 2011, the three leading
internet poker companies doing business in the United States were
PokerStars, Full Tilt Poker and Absolute Poker/Ultimate Bet
(collectively the "Poker Companies").  Because United States
banks were largely unwilling to process payments for an illegal
activity such as internet gambling, the three Poker Companies
used fraudulent methods to avoid these restrictions and to

receive billions of dollars from United States residents who gambled through the Poker Companies.  The principals of the Poker Companies, including defendants ISAI SCHEINBERG and PAUL TATE of PokerStars, SCOTT TOM and BRENT BECKLEY of Absolute Poker, and RAYMOND BITAR and NELSON BURTNICK of Full Tilt Poker, deceived or directed others to deceive United States banks and financial institutions into processing billions of dollars in payments for the Poker Companies, by, among other things, arranging for the money received from United States gamblers to be disguised as payments to hundreds of non-existent online merchants and other non-gambling businesses.

2.    To accomplish this deceit, ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK and PAUL TATE, the defendants, relied on highly compensated third party payment processors (the "Poker Processors") who lied to United States banks about the nature of the financial transactions they were processing and covered up those lies through the creation of phony corporations and websites to disguise payments to the Poker Companies.  These Poker Processors included, among others, RYAN LANG, BRADLEY FRANZEN, IRA RUBIN, and CHAD ELIE, the defendants, who, at various times relevant to this Indictment, processed and helped disguise payments to each of the three Poker Companies.

3.    Working together, the Poker Companies and Poker Processors deceived United States banks and financial

2

institutions - including banks insured by the Federal Deposit
Insurance Corporation - into processing billions of dollars in
gambling transactions for the Poker Companies.  Approximately
one-third or more of the funds deposited by gamblers went
directly to the Poker Companies as revenue through the "rake" the
Poker Companies charged players on almost every poker hand played
online.

### The Defendants and Their Associated Entities

4.   At all times relevant to this Indictment, ISAI
SCHEINBERG, the defendant, was a founder, owner, and principal
decision-maker for PokerStars, an internet poker company founded
in or about 2001 with headquarters in the Isle of Mann.  Through
its website, pokerstars.com, PokerStars provided real-money
gambling on internet poker games to United States customers.  At
various times relevant to this Indictment, PokerStars did
business through several privately held corporations and other
entities, including but not limited to Oldford Group Ltd.,
Rational Entertainment Enterprises Ltd., Pyr Software Ltd.,
Stelekram Ltd. and Sphene International Ltd. (collectively,
"Pokerstars").

5.   At all times relevant to this Indictment, RAYMOND
BITAR, the defendant, was a founder, owner, and principal
decision-maker for Full Tilt Poker, an internet poker company
founded in or about 2004 with headquarters in Ireland.  Through

3

its website, fulltiltpoker.com, Full Tilt Poker provided real-
money gambling on internet poker games to United States
customers.  At various times relevant to this Indictment, Full
Tilt Poker did business through several privately held
corporations and other entities, including but not limited to
Tiltware LLC, Kolyma Corporation A.V.V., Pocket Kings Ltd.,
Pocket Kings Consulting Ltd., Filco Ltd., Vantage Ltd., Ranston
Ltd., Mail Media Ltd., and Full Tilt Poker Ltd. (collectively,
"Full Tilt Poker").  As of March 2011, Full Tilt Poker was the
second-largest poker operator offering gambling on poker games to
United States residents.

      6.    At certain times relevant to this Indictment,
SCOTT TOM, the defendant, and his step-brother, BRENT BECKLEY,
the defendant, were founders and/or principal decision-makers for
Absolute Poker, an internet poker company founded in or about
2003 with headquarters in Costa Rica.  Through its websites,
absolutepoker.com and ultimatebet.com, Absolute Poker provided
real-money gambling on internet poker games to United States
customers.  At various times relevant to this Indictment,
Absolute Poker did business through several privately held
corporations and other entities, including but not limited to SGS
Systems Inc., Trust Services Ltd, Fiducia Exchange Ltd., Blue
Water Services Ltd., and Absolute Entertainment, S.A.  In or
around October 2006, Tokwiro Enterprises was identified as the

owner of record of Absolute Poker and a companion poker and blackjack gambling website, Ultimate Bet.  In around August 2010, ownership of Absolute Poker and Ultimate Bet was transferred to Blanca Games, Inc. of Antigua (collectively, these entities are "Absolute Poker").

7.    At certain times relevant to this Indictment, NELSON BURTNICK, the defendant, was an executive in the payment processing departments of PokerStars and Full Tilt Poker.  From in or about October 2006 through in or about November 2008 BURTNICK was an employee in the payment processing department of PokerStars, where he ultimately served as the head of payment processing.  From in or about January 2009 up to and including in or about March 2011, BURTNICK served as head of the payment processing department for Full Tilt Poker.

8.    From at least in or about the summer of 2006 up to and including in or about March 2011, PAUL TATE, the defendant, was an employee of PokerStars, including in the payment processing department.  From in or about early 2009, up to and including in or about March 2011, TATE served as the head of the payment processing department for PokerStars.

9.    From at least in or about October 2006, up to and including at least in or about the spring of 2010, RYAN LANG, the defendant, worked with the Poker Companies to identify Poker Processors willing to process payments for the Poker Companies,

including through deceptive means.  In this capacity, LANG acted
as an intermediary between principals of the Poker Companies,
including defendants ISAI SCHEINBERG, RAYMOND BITAR, BRENT
BECKLEY, NELSON BURTNICK and PAUL TATE, and the Poker Processors.

10.  From at least in or about 2007, up to and
including on or about March 2011, BRADLEY FRANZEN, the defendant,
worked with internet gambling companies including the Poker
Companies, to identify Poker Processors willing to process
payments for the Poker Companies, including through deceptive
means.  In this capacity, FRANZEN acted as an intermediary
between principals of the Poker Companies, including defendants
BRENT BECKLEY and NELSON BURTNICK, and the Poker Processors.

11.  From at least in or about 2007, up to and
including in or about March 2011, IRA RUBIN, the defendant,
processed payments for various internet gambling companies,
including each of the Poker Companies, by disguising the payments
as payments to dozens of phony internet merchants.

12.  From at least in or about the summer of 2008, up
to and including in or about March 2011, CHAD ELIE, the
defendant, together with others, opened bank accounts in the
United States, including through deceptive means, through which
each of the Poker Companies received payments from United States-
based gamblers.

13.    From at least in or about September 2009, up to
and including in or about March 2011, JOHN CAMPOS, the defendant,
was the Vice Chairman of the Board of Directors and part owner of
SunFirst Bank in St. George, Utah, which processed payments for
PokerStars and Full Tilt Poker.

### The Enactment of the UIGEA

14.    On or about October 13, 2006, the United States
enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"),
making it a federal crime for gambling businesses to "knowingly
accept" most forms of payment "in connection with the
participation of another person in unlawful Internet gambling."
Following the passage of the UIGEA, leading internet gambling
businesses – including the leading internet poker company doing
business in the United States at that time – terminated their
United States operations.

15.    On various dates in October 2006, notwithstanding
the passage of the UIGEA, the Poker Companies issued public
statements indicating that they intended to continue offering
gambling on internet poker in the United States.  For example, in
an October 16, 2006 press release, Absolute Poker – whose United
States citizen founders had relocated to Costa Rica – noted that
Absolute Poker was a "privately held operation, which gives our
business model more flexibility and creativity in operating."
Absolute Poker also claimed that its payment transactions were

done "within the framework of the international banking system, which the U.S. Congress has no control over."

### The Scheme to Defraud

16.   As set forth more fully below, at most times relevant to this Indictment, because internet gambling businesses such as those operated by the Poker Companies were illegal under United States law, internet gambling companies, including the Poker Companies, were not permitted by United States banks to open bank accounts in the United States to receive proceeds from United States gamblers.  Instead, both prior to and particularly after the passage of the UIGEA, the principals of the Poker Companies, including ISAI SCHEINBERG, RAYMOND BITAR, SCOTT TOM, BRENT BECKLEY, NELSON BURTNICK and PAUL TATE, the defendants, operated through various deceptive means designed to trick United States banks and financial institutions into processing gambling transactions on the Poker Companies' behalf.

Fraudulent Credit Card Processing

17.   Beginning in or about 2001, credit card companies Visa and MasterCard introduced regulations requiring member banks that processed credit card transactions for merchants (so-called "acquiring banks") to apply a particular transaction code to internet gambling transactions.  Thereafter, certain U.S. banks that issued credit cards to U.S. consumers (so-called "issuing banks") elected not to extend credit to customers for internet

gambling purposes and as a matter of policy automatically declined transactions bearing that internet gambling transaction code. The number of U.S. issuing banks declining such transactions increased significantly over time such that, even prior to the passage of the UIGEA in October 2006, most United States banks blocked transactions containing the internet gambling code.

18. In order to circumvent the Visa and MasterCard regulations and trick U.S. banks into authorizing their internet gambling transactions, ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK and PAUL TATE, the defendants, worked with and directed others to apply incorrect transaction codes to their respective Poker Companies' internet gambling transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were completely unrelated to internet gambling.

19. One method used by the members of the conspiracy to trick the United States banks into approving internet gambling charges involved the creation of phony non-gambling companies that the Poker Companies used to initiate the credit card charges. At various times alleged in this Indictment, RAYMOND BITAR, BRENT BECKLEY, and NELSON BURTNICK, the defendants, worked with other members of the conspiracy to create such fictitious companies - including phony online flower shops and pet supply

stores – that established Visa and MasterCard merchant processing
accounts with offshore banks.  When Full Tilt Poker and Absolute
Poker processed a transaction through one of these phony
companies without applying a gambling code to the transaction,
the United States issuing bank would be tricked into approving
the gambling transaction even if its policy was to not allow the
extension of credit for internet gambling.  Because the credit
card networks were often able to detect the fraudulent nature of
these phony merchants after a period of time and to shut down
processing for those phony merchants, BITAR, BECKLEY and
BURTNICK, and their co-conspirators, arranged for a supply of
stand-by phony merchants to be used when a particular phony
merchant was discovered.  For example, an Absolute Poker document
from in or around the fall of 2007 identifies approximately
twenty phony internet shopping companies then being used by
Absolute Poker to disguise credit card transactions, including,
among others, www.petfoodstore.biz and www.bedding-superstore.tv.

        20.  A second method used by the members of the
conspiracy to trick United States banks involved the use of
certain pre-paid credit cards.  At various times alleged in this
Indictment, the Poker Companies, through, among others, ISAI
SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK, and
PAUL TATE, the defendants, and their co-conspirators developed
so-called "stored value cards" – such as pre-paid debit cards or

even pre-paid "phone" cards – that could be "loaded" with funds from a U.S. customer's credit card without using a gambling transaction code.  Once "loaded" in this way, the stored value cards were used by gamblers almost exclusively to transfer funds to Poker Companies and other gambling companies.  To avoid detection, SCHEINBERG, BITAR, BECKLEY, BURTNICK, and TATE, and their co-conspirators, arranged for fake internet web sites and phony consumer "reviews" of the stored value cards so that it would appear that the stored value cards had some other legitimate purpose.

<u>Fraudulent E-Check Processing</u>

21.  Because Visa and MasterCard sought to identify and block attempts to circumvent their rules requiring internet gambling transactions to be correctly identified – so that banks could decline to accept them if they wished – the Poker Companies were unable to process credit card transactions consistently, even through their use of fraudulent means.  Accordingly, ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK, and PAUL TATE, the defendants, and others, worked with and directed others to develop yet another method of deceiving United States banks and financial institutions into processing their respective Poker Companies' internet gambling transactions, through fraudulent e-check processing.

22.  At all times relevant to this Indictment, the Automated Clearinghouse (or "ACH") system was an electronic network, administered by the Federal Reserve, that allowed for electronic fund transfers to and from United States bank accounts through "e-checks" or "electronic checks."  At various times relevant to this Indictment, the Poker Companies, through among others ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK, and PAUL TATE, the defendants, increasingly focused their payment systems on e-checks.

23.  A principal difficulty for the Poker Companies in e-check processing was that the ACH system required the merchant to open a processing account at a United States-based Originating Depository Financial Institution (or "ODFI").  Because the Poker Companies were not legally able to offer gambling in the United States, the Poker Companies could not - and did not - seek to open bank accounts for e-check processing in the names of their businesses.  Instead, the Poker Companies found third parties - the Poker Processors - willing to open the bank accounts and process these e-check transactions on behalf of the Poker Companies using the names of phony companies.

24.  In furtherance of this aspect of the scheme, ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK, and PAUL TATE, the defendants, relied on various middlemen, including RYAN LANG and BRADLEY FRANZEN, the defendants, to connect their

12

respective Poker Companies with payment processors willing to handle internet poker e-check transactions.  Following these introductions, SCHEINBERG, BITAR, BECKLEY, BURTNICK, and TATE entered into processing agreements with certain of the e-check processors.  The agreements provided the e-check processors with fees for processing each e-check transaction that were substantially higher than fees paid for standard e-check processing for legitimate, non-gambling merchants.  The Poker Companies, including through SCHEINBERG, BITAR, BECKLEY, BURTNICK, and TATE, then worked with the e-check processors and other co-conspirators to disguise the Poker Companies' receipt of gambling payments so that the transactions would falsely appear to United States banks as non-gambling transactions.

25.  At all times relevant to this Indictment, the Poker Companies, through ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK, and PAUL TATE, the defendants, and others, and the e-check processors, typically accomplished fraudulent e-check processing as follows:

a.  First, the e-check processors – sometimes directly, and sometimes through third parties – opened bank accounts at United States-based ODFI banks in order to process the Poker Companies' e-check transactions through the ACH system. The e-check processors typically lied to the ODFI bank about the purpose of the account, falsely claiming that the account would

be used to process e-checks for a wide variety of e-commerce
merchants without disclosing that, in fact, they would be used to
process internet gambling transactions.  In some cases, the e-
check processors offered specific lies about the identity of
these purported e-commerce merchants.  In several cases, for
example, the e-check processors falsely told the banks that the
transactions were for particular purported internet shopping
sites, such as an online store selling watches, when, in reality,
as the e-check processors well knew, the transactions were for
the Poker Companies.

      b.   Second, the e-check processors worked with the
Poker Companies, including with ISAI SCHEINBERG, RAYMOND BITAR,
BRENT BECKLEY, NELSON BURTNICK, and PAUL TATE, the defendants, in
the creation of dozens of phony corporations and corresponding
websites so that the money debited from U.S. customer's banks
would falsely appear to United States banks to be consumer
payments to non-gambling related businesses.  For example, in or
about mid-2008, IRA RUBIN, the defendant, together with co-
conspirators, created dozens of phony e-commerce websites
purporting to sell everything from clothing to jewelry to golf
clubs to bicycles which, in reality, and as RUBIN and his co-
conspirators well knew, would in fact be used to disguise
PokerStars's gambling transactions.  In another example, in or
around June 2009, BRADLEY FRANZEN, the defendant, working with

multiple co-conspirators, created a phony business called "Green2YourGreen" to be used to disguise payments from U.S. gamblers destined for each of the Poker Companies.    FRANZEN's co-conspirators falsely told multiple United States banks insured by the FDIC, including Citibank and Wells Fargo Bank, among others, that "Green2YourGreen" was a "direct sales" business that allowed consumers to buy environmentally friendly household products and sell them to other consumers in return for commissions.    Indeed, the phony Green2YourGreen website that FRANZEN's co-conspirators created to disguise the gambling transactions listed numerous products that were purportedly for sale and contained "testimonials" about the benefits of green living.

         c.    The development and selection of phony merchants and websites to serve as cover for the poker processing was conducted in close coordination with the Poker Companies themselves, including with ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, NELSON BURTNICK, and PAUL TATE, the defendants.    When a U.S. gambler entered his or her checking account information on one of the Poker Company's websites, the e-check transaction was submitted through the ACH system using the name of one of the phony businesses rather than the name of the Poker Company, and the charge appeared on the customer's bank account under this phony name.    The e-check processors' computer systems communicated with the computer systems of the Poker Companies so

that when a gambler entered e-check information on one of the
Poker Operator's websites, the gambler and Poker Operator
received notice of the name of the phony merchant that would
appear on the customer's bank account statement, in lieu of the
name of the Poker Company, as having initiated the charge.  For
example, in or around February 2009, two gamblers ("Gambler 1"
and "Gambler 2") made e-check payments to PokerStars and received
e-mails immediately thereafter from PokerStars that
"oneshopcenter" and "mygolflocations," respectively, would appear
as the party initiating the charge on their respective bank
statements.  At the time, "oneshopcenter.com" and
"mygolflocation.com" were purported internet merchants that
falsely claimed to sell clothing and jewelry (for
oneshopcenter.com) and golf clubs (for mygolflocation.com).

     d.    Similarly, the Poker Companies worked with the
Poker Processors to coordinate responses to customer inquiries to
the phony merchants, including the complaints of gamblers
confused by the phony merchant name appearing on their checking
account statement.  For example, in or around March 2009, Gambler
1 and Gambler 2 sent e-mails to purported customer service
addresses listed by oneshopcenter.com and mygolflocation.com
regarding attempts to purchase particular items.  Gambler 1 and
Gambler 2 received responses not from these websites, but from
individuals identifying themselves as customer service employees

of PokerStars replying from e-mail addresses associated with

PokerStars.

        e.    Tracking all of the phony merchants used to

disguise gambling transactions created administrative and

technical difficulties for the Poker Companies.  For example, a

PokerStars document from in or about May 2009 provided as

follows:

> It's not unusual for PokerStars to have their [*sic*]
> transactions identified by 30+ descriptors [the name of the
> merchant appearing on the consumer's credit card or checking
> account] at any point in time.  The purpose of a descriptor
> is to help the customer identify the source of the
> transaction, be it credit card or electronic funds transfer.
> Unfortunately PokerStars does not have this luxury; relying
> on whatever descriptor the processor can get approved by the
> bank.  These descriptors are diverse, often vague and rarely
> reflect the nature of the transaction in any way.  In fact
> most descriptors strongly imply the transaction has nothing
> to do with PokerStars (i.e. BICYCLEBIGSHOP.COM,
> GOLFSHOPCENTER.COM, VENTURESHOPPING.COM etc). Whilst some
> players read confirmation emails and understand the process,
> many do not and it is all too easy for a player to say to
> their bank "I've never made a purchase at
> BICYCLEBIGSHOP.COM". As a result chargebacks (Not Auth &
> Stop Payments) are increasing which in turn jeopardizes the
> relationship with the processor and their banks.

To address the issue, PokerStars modified its software so, where

possible, a consistent phony descriptor would appear on the bank

statements of a given U.S. customer.

        26.   ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY,

NELSON BURTNICK, and PAUL TATE, the defendants, worked with

multiple e-check processors introduced to them by defendants RYAN

LANG, BRADLEY FRANZEN, and others, many of which the Poker

Companies used simultaneously.  These e-check providers included the following:

     a.   <u>Intabill</u>  In or around the spring of 2007, LANG introduced SCHEINBERG, BITAR, and BECKLEY to a method of e-check processing offered by Intabill, an Australia-based payment processing company.  Because Intabill did not have direct access to United States ACH processing accounts, Intabill "sub-contracted" its processing to various United States based e-check processors.  With the knowledge and approval of SCHEINBERG, BITAR, BECKLEY, BURTNICK and TATE, Intabill disguised the gambling transactions as the transactions of dozens of phony financial services merchants.  Intabill processed at least $543,210,092 of transactions for the Poker Companies from mid-2007 through March 2009.  In or around March 2009, the Poker Companies ceased processing through Intabill, in part because Intabill owed them tens of millions of dollars for past processing.

     b.   <u>CHAD ELIE</u>  In 2008 and 2009, CHAD ELIE, the defendant, had worked with Intabill to establish processing accounts for internet gambling that were disguised as accounts set up to process repayments of so-called "payday loans," which were high-interest, high-risk loans unrelated to gambling transactions.  In or about August and September 2009, working with FRANZEN, ELIE processed transactions on behalf of Full Tilt

Poker.  Also in or about August and September 2009, working with
BECKLEY, ELIE processed transactions on behalf of Absolute Poker
through a bank account at Fifth Third Bank that ELIE told the
bank was an account to be used for internet marketing
transactions.  ELIE's deceptive processing through Fifth Third
Bank terminated in September 2009 when the bank froze the funds,
which were subsequently seized by U.S. law enforcement through a
judicial warrant.

      c.  <u>Intabill's U.S. Representative</u>   In or around March
2009, Intabill's former U.S.-based representative, Andrew
Thornhill, began seeking to process transactions for the Poker
Companies himself, communicating at various times with
SCHEINBERG, TATE, FRANZEN, and ELIE, among others, about
potential processing.  In or around June 2009, Thornhill and
FRANZEN began processing e-checks for each of the Poker Companies
disguised as payments to the phony "Green2YourGreen"
environmentally friendly household products company described in
paragraph 25(b) of this Indictment.  The Green2YourGreen
processing lasted only a few months, until approximately August
2009, when Citibank and Wells Fargo Bank, among others,
discovered that the transactions were, in fact, for internet
gambling and terminated the accounts.  At that time, the proceeds
of these accounts were then seized by U.S. law enforcement
pursuant to a judicial warrant.

d.    <u>The Arizona Processor</u>    In or around December 2008, after learning that Intabill was unlikely to continue processing, SCHEINBERG, BITAR, BECKLEY, BURTNICK and TATE began processing payments through an Arizona payment processor (the "Arizona Processor"), which was assisted at times by a company operated by LANG.  From in or about December 2008 through on or about June 1, 2009, the Arizona Processor processed more than $100 million in payments primarily from U.S. gamblers to each of the Poker Companies; all of these transactions were processed using the names of phony merchants so as falsely to appear unrelated to internet gambling.  On or about June 1, 2009, the Arizona Processor ceased processing transactions for the Poker Companies following the seizure of its bank accounts by U.S. law enforcement pursuant to a judicial warrant.

e.    <u>IRA RUBIN</u>    At various times relevant to this Indictment, each of the Poker Companies employed IRA RUBIN, the defendant, his company E-Triton, and various of RUBIN's associates, including an e-check processor in California (the "California Processor"), to process their internet gambling transactions disguised as legitimate online merchant transactions, in order to trick U.S. banks into authorizing the transactions.  For example, in or about mid-2008, SCHEINBERG and BURTNICK hired RUBIN's company E-Triton to process PokerStars transactions disguised as payments to dozens of phony web stores,

including oneshopcenter.com and mygolflocation.com, which RUBIN
sub-contracted to the Arizona Processor.  In another example, in
or about June 2009, following the Arizona Processor's termination
of its processing activities, BURTNICK and FRANZEN arranged for
two of RUBIN's associates to process payments for Full Tilt Poker
disguised as payments to a medical billing company, until
accounts related to that processing were seized by judicial order
in or about September 2009.  In a final example, at various times
from approximately 2008 up to and including in or about March
2011, BECKLEY hired RUBIN to process e-checks for Absolute Poker
disguised as, among other things, payroll processing, affiliate
marketing, and online electronics merchants.

"Transparent Processing"

        27.  In or around late 2009, following the collapse of
multiple e-check processing operations used by the Poker
Companies and the judicially ordered seizure of funds, ISAI
SCHEINBERG and RAYMOND BITAR, the defendants, begin exploring a
new payment processing strategy - so-called "transparent
processing" - and directed the heads of their payment processing
departments, PAUL TATE and NELSON BURTNICK, the defendants, to
find, at least where possible, processing solutions that did not
involve lies to banks.  Despite their expressed desire for
"transparent" processing, PokerStars and Full Tilt Poker

continued to rely on processors who disguised the poker transactions.

28.   In order to find "transparent" processors, ISAI SCHEINBERG, RAYMOND BITAR, NELSON BURTNICK and PAUL TATE, the defendants, turned to processors who had worked with the Poker Companies before, including defendants RYAN LANG, BRADLEY FRANZEN, and CHAD ELIE.  The Poker Companies had previously sued ELIE for allegedly stealing $4 million of the Poker Companies' money.  ELIE was accepted as a source for "transparent" processing following a conversation between ELIE and SCHEINBERG in or about the fall of 2009 in which ELIE agree to repay some of this money.

29.   Because it was illegal to process their internet gambling transactions, the Poker Companies had difficulty in identifying "transparent" processors.  CHAD ELIE, the defendant, and his associates were, however, able to persuade the principals of certain small, local banks that were facing financial difficulties to engage in such processing.  In exchange for this agreement to process gambling transactions, the banks received sizeable fee income from processing poker transactions as well as promises of multi-million dollar investments in the banks from ELIE and his associates.  In at least one case, a payment to a bank official who approved the processing was made as well.

30.    For example, in or around September 2009, CHAD ELIE, the defendant, together with Andrew Thornhill and a partner of ELIE's ("Elie's Partner") approached JOHN CAMPOS, the defendant, the Vice Chairman of the Board and part-owner of SunFirst Bank, a small, private bank based in Saint George, Utah. CAMPOS, while expressing "trepidations" about gambling processing, proposed in a September 23, 2009 e-mail to accept such processing in return for a $10 million investment in SunFirst by ELIE and Elie's Partner, which would give ELIE and Elie's Partner more than 30% ownership of the bank. ELIE and Elie's Partner made an initial investment in SunFirst Bank of approximately $3.4 million in approximately December 2009. On or about November 29, 2009, Andrew Thornhill told an associate "things are going well with the bank we purchased in Utah and my colleagues and I are looking to purchase another bank for the purpose of repeating our business plan. We probably could do this for a grand total of 3 or 4 banks."

31.    On or about December 14, 2009, SunFirst Bank began processing payments for Pokerstars and FullTilt Poker. On or about April 8, 2010, JOHN CAMPOS, the defendant, sent an "invoice" to Elie's Partner requesting that $20,000 be paid to a corporate entity that CAMPOS controlled as a "bonus" for "Check and Credit Card Processing Consulting." SunFirst Bank processed over $200 million of payments for PokerStars and Full Tilt Poker

23

through on or about November 9, 2010, when, at the direction of the FDIC, it ceased third party payment processing. SunFirst Bank earned approximately $1.6 million in fees for this processing.

<u>Statutory Allegations</u>

32. From at least on or about October 13, 2006, up through and including in or about March 2011, in the Southern District of New York and elsewhere, ISAI SCHEINBERG, RAYMOND BITAR, SCOTT TOM, BRENT BECKLEY, NELSON BURTNICK, PAUL TATE, RYAN LANG, BRADLEY FRANZEN, IRA RUBIN, CHAD ELIE, and JOHN CAMPOS, the defendants, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, violations of Title 31, United States Code, Section 5363.

33. It was a part and an object of the conspiracy that ISAI SCHEINBERG, RAYMOND BITAR, BRENT BECKLEY, SCOTT TOM, NELSON BURTNICK, PAUL TATE, RYAN LANG, BRADLEY FRANZEN, IRA RUBIN, CHAD ELIE, and JOHN CAMPOS, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, with persons engaged in the business of betting and wagering, would and did knowingly accept, in connection with the participation of another person in unlawful internet gambling, to wit, gambling in violation of New York Penal Law Sections 225.00 and 225.05 and the laws of other states where the gambling businesses operated,