UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA           :

   -v.-                                             :

                                                 S3 10 Cr. 336 (LAK)

BRENT BECKLEY,                     :

        Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


# SENTENCING MEMORANDUM


                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York
                    *Attorney for the United States*
                          *of America*

Arlo Devlin-Brown
Assistant United States Attorney
    *- Of Counsel -*



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building

One Saint Andrew's Plaza
New York, New York 10007

July 3, 2012

**By Hand & ECF**
Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

     Re: <u>United States v. Brent Beckley</u>, S3 10 Cr. 336
        **Sentencing Submission**

Dear Judge Kaplan:

   The Government writes with respect to the sentencing of Brent Beckley, and to address the defendant's sentencing submissions of May 14, 2012 and June 22, 2012. This submission also addresses the Court's Order of May 18, 2012 notifying the parties that it is considering an upward departure.

   The parties stipulated pursuant to a plea agreement to Guidelines calculations (agreed to by the Probation Department) resulting in an applicable sentencing range of 12-18 months, and further stipulated that "neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted." Both parties, however, reserved the right to seek a non-Guidelines sentence (as Beckley has done in this case) based on the factors set forth in 18 U.S.C. § 3553(a).

   As set forth in greater detail herein, the Government submits that an upward departure is not appropriate but that the issues identified in the Court's Order – namely, the scope of Absolute Poker's operations and the means it used to operate – do bear on several of the sentencing factors in 18 U.S.C. § 3553(a). At the same time, the Government agrees with the defendant that other § 3553(a) factors more personal to the defendant – including the compelling account of childhood hardship and the defendant's prompt and fulsome acceptance of responsibility – play a mitigating role. In balancing those factors, a sentence within the Guidelines range of 12-18 months would not be unreasonable.

I.    **Absolute Poker Background**

      Absolute Poker was a Costa Rica-based internet gambling operation founded by Beckley's co-defendant and stepbrother Scott Tom (as well as several of Tom's college fraternity friends) in approximately 2003. PSR ¶ 30. In October 2006, the United States enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"), which caused Partygaming PLC – the market leader in internet poker – and several other large internet poker companies to leave the United States market. PSR ¶ 33. Absolute Poker, however, saw the new law as an opportunity to increase its market share. In a press release issued following the UIGEA's enactment, Absolute Poker declared that it would continue to do business in the United States because it was a "privately held operation, which gives our business model more flexibility and creativity in operating." PSR ¶ 34. The same press release also claimed that its payment transactions were done "within the framework of the international banking system, which the U.S. Congress has no control over." *Id.*

      After the UIGEA's enactment, Pokerstars, Full Tilt Poker, and Absolute Poker dominated the United States-facing internet gambling industry (PSR ¶ 27), but Absolute Poker soon suffered a grievous blow to its reputation. In November 2008, a joint investigation by 60 Minutes and the Washington Post revealed that company insiders had used "administrative" accounts in the game software to see the cards of other players, giving the insiders an unbeatable edge that allowed them to steal millions of dollars from their customers (*see, e.g.,* http://www.cbsnews.com/ 2100-18560_162-4633254.html). (Importantly, the Government is not aware of evidence indicating that Beckley was involved in or had contemporaneous knowledge of this scheme). While Absolute Poker repaid the victims, the company's reputation never fully recovered. Absolute Poker nonetheless continued on as the number three internet poker operator doing business in the United States and took in an estimated five hundred million dollars from U.S. residents until the website was shut down on April 15, 2011 in connection with the above indictment and a related civil money laundering and asset forfeiture action against the company.

II.   **Beckley's Role at Absolute Poker**

      Beckley joined Absolute Poker in 2003, not long after it was founded, and soon relocated to Costa Rica, where he ultimately became the head of payment processing for the company. Prior to the enactment of the UIGEA, payment processing was relatively straightforward: the Poker Companies relied heavily on Neteller PLC, a publicly traded Canadian company, which offered a "virtual wallet" enabling consumers to load their Neteller accounts with funds that could be transferred to various internet gambling companies. In January 2007, however, following the enactment of the UIGEA, Neteller founders Stephen Lawrence and John Lefebvre were arrested on illegal gambling charges and the company immediately left the United States market. Following Neteller's collapse, the directors of payment processing for each of the Poker Companies faced unparalleled challenges in finding payment processors who were still willing to handle internet gambling transactions. And those payment processors who remained were, given the illegal nature of the processing, at best

unreliable and at worst thieves, resulting in a constant struggle to find new payment processing channels.

As head of payment processing, Beckley employed third party solutions involving the miscoding of credit cards – a way to avoid bank-imposed restrictions on the use of credit cards for internet gambling. PSR ¶¶ 36-39. Visa and Mastercard required merchant banks to apply a particular transaction code, 7995, to internet gambling credit transactions, which gave card issuing banks an opportunity to block these transactions. PSR ¶ 36. Beckley would contract with third party processors around the world who would set up dummy corporations – complete with phony e-commerce websites to make it appear that the company had nothing to do with gambling – and submit Absolute Poker credit card transactions as the transactions of these dummy companies, and without the "7995"code. PSR ¶ 37. Through this process, United States issuing banks would be tricked into approving transactions (and thus extending credit to their cardmembers) that the banks otherwise would have declined. PSR ¶ 38. Because Visa and Mastercard searched for and rooted out these phony processing companies, Beckley and the processors he contracted with played a constant "cat and mouse" game of setting up new credit card processing "solutions" to replace those shut down. *Id.*

In addition to mi-scoded credit card processing, Beckley relied on electronic check processors, including co-defendants Chad Elie and Ira Rubin, to obtain United States bank accounts in the names of various non-gambling companies and use those accounts to move monies from the bank accounts of U.S. players to, ultimately, accounts controlled by Absolute Poker. PSR ¶¶ 40-45. As with the miscoded credit cards, obtaining reliable e-check processing was a constant challenge, with processors routinely shut down by banks and the Government, and with the money held by the processors either being judicially seized, frozen by the banks, or simply taken by the processor in question. *Id.*

Beckley continued in this role as head of payment processing until at least April 15, 2011, when the Indictment in this case was unsealed. Following discussions that commenced soon after the Indictment, Beckley returned voluntarily to the United States in December 2011 and promptly pled guilty.

**III.     Sentencing Considerations**

The parties agree with the Probation Department on the applicable guidelines calculations.  The offense level for illegal gambling is 12 (U.S.S.G. § 2E3.1), and the Guidelines provide for no adjustments based on the size or scope of the gambling operation at issue.[1]  The existence of a bank/wire fraud charge, grouped with the gambling offense, similarly has no impact on the Guidelines. There is no evidence that Beckley intended to cause ultimate financial losses to banks, and no banks have identified for the Government actual losses attributable to Absolute Poker processing. Accordingly, the applicable Guidelines range is 12 to 18 months' imprisonment.

The Government also agrees with the defendant that no upward departure is appropriate here.  The fraud guideline is designed to calibrate punishment primarily based on fraud loss, and gambling operations such as this are unlikely to cause large financial losses to banks through "mis-coding" or other steps that disguise the identity of the merchant.  This is not because the transactions are riskless but because banks, recognizing the risks associated with all merchant processing (particularly internet merchant processing) require payment processors to post reserves that will in most cases be sufficient to absorb any such losses.  And while there are still scenarios where the bank is likely to bear the loss itself,[2] the nature of the processing – tricking banks into thinking gambling transactions are on behalf of some other merchant – means that these banks are not able to track such losses as they occur, and attempting to reverse engineer losses would be a task of forensic complexity that no bank, to the Government's knowledge, has undertaken in this case.  Still, based on the information currently known the Government, it appears that losses suffered by banks are unlikely to be significant.  The Government further agrees with the defendant that treating gain as a substitute for loss is a measure appropriately suited for cases where gain provides a rough approximation of otherwise unverifiable losses, which is not the case here.  Accordingly, the Government does not seek the imposition of an upward departure.

The size and scope of Absolute Poker's operation, and the means through which it operated, are still relevant to the consideration of the factors set forth in 18 U.S.C. § 3553(a), including the "nature and circumstances of the offense," the "seriousness of the offense," the need "to promote respect for the law, and to provide just punishment for the offense" and "to

---

[1]     Although Beckley did not plead guilty to money laundering, it is worth noting that money laundering guideline likewise does not vary based on the gambling operation's size because, where "the defendant committed the underlying offense," the guideline is based on the fixed gambling offense level of 12  rather than the amount of funds at issue. U.S.S.G. § 2S1.1(a)(2)

[2]     For example, if a bank that declines to approve properly coded gambling charges is tricked by mis-coding into allowing a compulsive gambler to run up a large credit card debt that she will never be able to repay, the bank will ultimately have to write off the loss.

afford adequate deterrence." Operating a large-scale gambling business that depends on the systematic disguising of hundreds of millions of dollars is undoubtedly more serious and less respectful of the law than operating a small informal poker room in the back of a bar. Among other things, it is important that the billions of dollars of payment transactions moving through the U.S. and international financial system is not disguised so people charged with monitoring such movements of money, be they bank officers, regulators or law enforcement officials, can do their jobs.[3] These factors surely merit consideration as some of the many inputs in the broad § 3553(a) analysis.

This is not to say that Beckley's sentence should be identical to a sentence imposed on anyone working for such an operation. Indeed, given the limited Guidelines adjustments that are applicable (mostly role adjustments), the differences in Guidelines ranges among defendants with identical criminal histories is likely to comparatively small. Accordingly, a close comparison between defendants charged in this case[4] and assessment of their relative conduct is essential to advance the sentencing goals in 18 U.S.C. § 3553(a). To date, six of the eleven defendants charged have been arrested and convicted (with the remaining defendants, for now, outside of the United States).[5] Two of these defendants – Ryan Lang and Bradley Franzen – were essentially middle men who linked the Poker Companies to payment processors, knowing that they were using fraudulent means to process the transactions. Two more defendants – Ira Rubin and Chad Elie – were payment processors, and both made misrepresentations to banks to induce them to process gambling transactions. John Campos allowed his bank to be used for poker processing in return for a sizeable investment in the bank (but did not disguise the transactions), and was recently sentenced by the Court to 3 months' imprisonment. Beckley is the only defendant convicted to date who was employed by one of the Poker Company's directly.

---

[3]   As noted in matters relating to other defendants, even a conviction for money laundering (and therefore the application of the money laundering guideline) would not address the scope of the internet gambling operation because that guidelines is not based on the amount laundered but on the underlying gambling offense (gambling, level 12) if the "the defendant committed the underlying offense." U.S.S.G. § 2S1.1(a)(2).

[4]   The comparison with defendants charged in other, different, cases is less helpful. Among other distinctions, all but two of the defendants cited by the defendant were cooperating witnesses. The chart is also incomplete, as it omits the 21 month sentence imposed by Judge Holwell on Curtis Pope, a payment processor for all three poker companies, in United States v Curtis Pope, 10 Cr. 675. This is not to suggest that Pope's sentence is of any great particular relevance either (among other things, Pope's sentence was based on a higher criminal history), only that comparisons to defendants other than those before the Court are not particularly instructive.

[5]   A seventh defendant, Raymond Bitar, was arrested yesterday on additional charges including a wire fraud scheme directed against Full Tilt Poker customers.

In assessing Beckley's relative culpability, several factors stand out in his favor. First, unlike Rubin (who was found hiding in Guatemala after the April 15, 2011 enforcement action) Beckley returned to the United States voluntarily from a country where extradition would have been a difficult prospect. Only two other defendants (Ryan Lang and, yesterday, Raymond Bitar) voluntarily returned to the United States to face the charges, and Beckley was the first defendant to do so by significant margin. Second, Beckley promptly pled guilty upon his return to gambling and fraud counts, including a managerial role enhancement, fully accepting complete responsibility for his conduct and the real likelihood of prison time. Beckley did so without first filing motions challenging the indictment, or waiting for the Court's ruling on motions filed by other defendants which, if granted, would mean dismissal of the charges (at least for those defendants).

While Beckley's timely plea of guilty was important to the Government in terms of conserving prosecutorial resources, his conduct once charges were initiated is also of relevance in assessing the character of the defendant more broadly, and in considering the need for specific deterrence. Unlike some in the industry (including co-defendants and otherwise), Beckley has never disputed that lying to banks about what payments are for is wrong, or that the underlying gambling business was illegal. Rather than offer tortured explanations for such conduct (or simply try to evade capture), Beckley simply owned up to it. Returning to the United States for this purpose, knowing that he faced the prospect of prison, suggests that Beckley seeks to draw a line under the past, accept the punishment that comes with it, and move on with his life. There is more promise in this than in a defendant whose pattern of conduct before and/or after indictment suggests an unwillingness to truly accept that financial machinations of the kind used to keep the Poker Companies in business are unacceptable. These factors, as well as the personal history described in the defense submission, are indeed considerations that favor Beckley.

Still, the Government cannot agree that the probationary sentence called for by the defense is appropriate. As noted above, the Poker Companies were large-scale and long-running illegal enterprises, and Beckley played an important role in helping one of these companies obtain the deceptive processing "solutions" so fundamental to its operation. The sentence imposed should therefore balance the significant positive factors particular to Beckley with the seriousness of the criminal offense to which Beckley has admitted.

        Respectfully submitted,

        PREET BHARARA
        United States Attorney

By:   /s/ Arlo Devlin-Brown
      Arlo Devlin-Brown
      Assistant United States Attorney
      Tel. (212) 637-2506